**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| WELLOGIX, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 11-cv-4056 |
| | § | |
| v. | § | JURY DEMANDED |
| | § | |
| | § | |
| SAP AMERICA, INC. and SAP A.G. | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

COMES NOW, WELLOGIX, INC. (hereinafter "Plaintiff" or "Wellogix"), complaining of SAP AMERICA, INC. and SAP A.G., (hereinafter collectively, "SAP" or "Defendants"), and for cause of action would respectfully show the following:

## INTRODUCTION AND BACKGROUND

1.      Wellogix is a cutting edge developer of an array of software solutions relating to the electronic procurement of products and services.  This functionality is commonly known as electronic "Purchase to Pay" ("P2P") in the industry.  More specifically, Wellogix's P2P software relates to the requisitioning of goods and services and the subsequent reconciliation of invoices related to complex projects.  Wellogix's P2P software is most directly applicable to and originally developed for use in the procurement of goods and services by oil and gas operators from oil and gas service companies for the complex projects of drilling and completing an oil or gas well.

2.      Wellogix, during various rounds of funding, raised over $40,000,000 in investment capital to develop its P2P software programs.  The current version of the software contains over tens

of thousands of man-hours of computer programming time.  The software is a robust, complete solution that covers all major aspects of the complex services portion of the electronic P2P process for oil and gas operators and service companies.  Wellogix's P2P software program is a highly valuable tool, capable of saving oil and gas operators and service companies millions of dollars per year, which leads to an increase in production of millions of dollars per year.  Wellogix was originally the only company capable of providing this type of software technology.

3.      In 1999, BP America, Inc. ("BP") hired Accenture, L.L.P. ("Accenture") as a consultant to assist BP in integrating a software product to utilize the Internet and create a paperless (i.e. electronic) process in oil field services.  After a thorough review of over twenty vendors, including SAP, Accenture recommended Wellogix, because Wellogix was the only company capable of using the Internet to create an electronic P2P process for complex services in the oil and gas industry.

4.      Wellogix's relationship with BP was formalized when Wellogix and BP, with support from Accenture, entered into the Pilot Program Agreement of May 15, 2000.  The pilot program demonstrated that digital electronic communication was possible.  The pilot program proved to be successful and was concluded by mutual agreement of the parties in 2000.

5.      On January 2, 2002, Wellogix and BP entered into a Professional Services Agreement and related Master Software License Agreement and engaged in a project to demonstrate that it is possible to interface between various software components of Wellogix, Maximo, and SAP.  This project also proved to be successful.  At this point, it was clear that Wellogix's P2P software was effective and extremely valuable.

6.     Pursuant to the BP project and otherwise in its relationship with Wellogix, Accenture received highly confidential and proprietary information and trade secrets of Wellogix.  Accenture improperly failed to protect this information and trade secrets. Upon Information and belief, Accenture disclosed the information and secrets to SAP.

7.     SAP understood the extremely high value of the Wellogix P2P software program. Sometime after September 2002, Wellogix and SAP began discussing strategies for collectively contributing their various technology assets to create a unified solution for P2P using SAP software as the basic solution and Wellogix's P2P software for the complex services portion. SAP had established customer relationships with the software solution called SRM ("Supplier Relationship Management") that could perform some of the procurement functions.  However, and importantly, SAP did not have a solution for the procurement (requisitioning and reconciliation of invoices) of complex services.  Wellogix had a working version of this software, and SAP was aware that it worked in a large client environment such as BP.

8.     In March of 2005, in order to effect the seamless integration of third-party software products into its existing SAP products, SAP developed "middleware" software that it called "NetWeaver."  NetWeaver's purpose was to establish a standardized connection of third party products into an SAP product called "R3."  The "strategic partnership" between Wellogix and SAP was formalized on or about March 15, 2005, by and through the parties' Powered by SAP NetWeaver Cooperation Agreement (the "NetWeaver Partner Agreement").

9.     The NetWeaver Partner Agreement formalized Wellogix's and SAP intent to share revenue, co-management of NetWeaver certification, process, marketing activities and the development of promotional items.  The NetWeaver Partner Agreement explicitly recites that each

party retains full ownership and control of its own intellectual property.  SAP is required under the NetWeaver Partner Agreement to strictly to maintain the confidential information and trade secrets of Wellogix.

10.     As part of the NetWeaver Partner Agreement and after its execution, on or about March 22, 2005 through March 24, 2005, several SAP employees went to Wellogix's offices for a three-day workshop wherein Wellogix disclosed highly confidential information and trade secrets. The delegation was led by members of SAP's SRM business group and other employees from the corporate finance department in order for SAP to kick-off the NetWeaver Partner Agreement and perform its due diligence on Wellogix for the purpose of either investment in or the acquisition of Wellogix.  During the workshop, employees of SAP went through Wellogix's P2P software code in person with Wellogix personnel disclosing parts of the code structure.

11.     Effective August 1, 2005, SAP entered into the SAP Interface Certification Agreement for XI Content Certification ("XI Certification Agreement") with Wellogix," which contained additional confidentiality agreements post-certification. On June 16, 2005, SAP certified Wellogix's eField-Ticket SM Service Version 5.0 and Electronic Field Ticket 5.0.  On December 15, 2005, SAP certified Wellogix's Package for Invoice Routing and Processing Version 30.1.  The certifications confirm the existence of product functionality in accordance with SAP NetWeaver certification procedures.

12.     Wellogix and SAP developed joint marketing materials. Wellogix and SAP even went so far as to produce jointly branded business cards.  Repeatedly in joint marketing presentations, SAP sales personnel represented that Wellogix would provide the complex services portion of the P2P software solution being jointly marketed and that SAP partnered with Wellogix because

4

Wellogix had the only complete solution and that SAP's SRM software did not have that capability. This message was presented to SAP's investors and stock analysts at their annual meeting on or about December 2005. Wellogix's President J. Ike Epley was invited to the meeting and SAP proudly introduced Wellogix as one of the first NetWeaver certified partners.

13.     The NetWeaver certification process came at considerable time and expense to Wellogix. During the certification process, SAP had direct access to Wellogix's highly confidential information and trade secrets.

14.     SAP failed to keep this information confidential, improperly disclosed it, and ultimately used it improperly to replicate the capabilities of Wellogix's P2P software which was subsequently incorporated into SAP's SRM and ECC software products.

15.     On or about the morning of March 23, 2005, SAP employee, Manfred Heil, met with Wellogix personnel in Wellogix's offices. During that meeting, Heil reaffirmed SAP's commitment to marketing and implementing a joint electronic P2P solution for BP, including the use of Wellogix's P2P software.

16.     However, upon information and belief, in the afternoon, on or about March 23, 2005, Heil met with BP at its offices in Texas. At this meeting, Heil represented to BP employees Peter Zwart, Thomas Ceynow, Tracy Galloway, and possibly others, that SAP would provide a complete solution, including complex services, without the input and knowledge of Wellogix, even though Heil knew that SAP needed Wellogix for complex services.

17.     Upon information and belief, Heil informed these BP employees that he had seen what Wellogix had to offer and that SAP's SRM software would contain all of the required functionality that would have otherwise been provided by Wellogix. Upon information and belief, at

5

this and later meetings, SAP disclosed to its customers, including BP, a plan to divert the entire complex services business away from its partner, Wellogix by replicating the Wellogix technology in its own software products.

18.     Upon information and belief, similar conversations were held between SAP and other prospective Wellogix customers, including several prospective customers to whom SAP and Wellogix had co-marketed a joint solution.   Upon information and belief, in these conversations, it is believed that SAP specifically stated that SAP's software provided a complete solution to complex services.

19.     Upon information and belief, after Manfred Heil informed the BP employees of SAP's ability to provide the functionality of Wellogix's P2P software without Wellogix, SAP directed its employees to secretly replicate the complex services functionality for integration into the SAP SRM and/or ECC software packages and platforms.

20.     At all times, Wellogix was unaware of SAP's fraudulent designs, and continued to fully support and participate in the joint venture through March 2006.  Wellogix also continued to co-market opportunities with SAP, while SAP knew at all times, that it intended to exclude its partner Wellogix from any deal secured with the customers and prospects that Wellogix and SAP were courting with regard to their integrated P2P solution.

21.     Even after Wellogix's discovery of SAP's tortious interference with not only the BP business opportunity, but other opportunities as well, SAP continued to mislead and induce Wellogix's continued performance of the NetWeaver Partner Agreement, through which SAP could continue to have access to Wellogix's confidential information and trade secrets.

22.    Throughout this time period and beyond, SAP illegally availed itself of Wellogix's confidential information and trade secrets. SAP used the information that it misappropriated and/or stole from Wellogix for the ongoing development of its own software products.

23.    Wellogix has been irreparably harmed as a result of SAP actions.

## PARTIES

24.    Plaintiff Wellogix, Inc. is a Delaware corporation with its principal place of business in Harris County, Houston, Texas.

25.    Defendant SAP America, Inc.  is a Delaware corporation authorized and licensed to do business in Texas with its principal place of business in Delaware County, Newton Square, Pennsylvania. SAP America, Inc. maintains minimum contacts with Texas by consummating transactions in Texas and by purposefully availing itself of the benefits and protections of the laws of Texas.  SAP America, Inc. may be served through its registered agent at: CT Corporation Systems, 350 N. St. Paul Street, Dallas, Texas 75201.

26.    Defendant SAP A.G. is a German corporation authorized and licensed to do business in Texas with its principal place of business in Waldorf, Germany. SAP A.G. maintains minimum contacts with Texas by consummating transactions in Texas and by purposefully availing itself of the benefits and protections of the laws of Texas.  SAP A.G. may be served through its registered agent at: CT Corporation Systems, 350 N. St. Paul Street, Dallas, Texas 75201.

## JURISDICTION AND VENUE

27.    The Court has personal jurisdiction over SAP because SAP does business in this judicial district and has sufficient contacts in this judicial district. Additionally, SAP has already

availed itself of the jurisdiction of this Court by filing Civil Action No. 4:10-CV-1224, *SAP America, Inc. v. Wellogix, Inc.*, which is currently pending before the Honorable Sim Lake.

28.     Under 28 U.S.C. § 1332(a), this Court has subject matter jurisdiction because there is complete diversity of citizenship between Wellogix and SAP and the matter in controversy exceeds the sum or value of $75,000.

29.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a).

<u>COUNT I: MISAPPROPRIATION OF TRADE SECRETS</u>

30.     Wellogix repeats and re-alleges the allegations of the paragraphs in this Complaint as if fully set forth herein.

31.     Wellogix took reasonable steps to keep its confidential information as trade secrets and would not have disclosed its trade secrets to any party without agreement by the receiving party to keep them secret.  SAP, through its confidential and fiduciary relationship with Wellogix, acquired access to Wellogix's trade secrets.  By acknowledging and agreeing that Wellogix had valuable trade secrets, SAP owed a duty not to use or disclose these trade secrets without Wellogix's permission. SAP, without permission or legal authority from Wellogix, misappropriated this highly valuable technology in order to obtain and perform its agreement with BP and, upon information and belief, lucrative agreements with other parties.  As a direct result of this misappropriation, Wellogix has been damaged.

32.     As a matter of Texas law, SAP's wrongful use of Wellogix's technology has caused irreparable injury, and barring a license agreement or an injunction by this Court, such irreparable injury will continue.

33.     Additionally, Wellogix is entitled to recover its actual damages.

8

34.     Wellogix is entitled to an award of exemplary damages against SAP because SAP acted intentionally, with malice.  Furthermore, SAP's misappropriation, when viewed objectively from SAP's standpoint at the time of the occurrences, involved an extreme degree of risk, considering the possibility and magnitude of the potential harm to Wellogix and SAP had actual, subjective awareness of the risk but proceeded anyway with a conscious indifference to the rights, safety or welfare of Wellogix.

## COUNT II: THEFT OF TRADE SECRETS

35.     Wellogix repeats and re-alleges the allegations of the paragraphs in this Complaint as if fully set forth herein.

36.     SAP has wrongfully appropriated, secured and/or stolen property and services of Wellogix with the intent to deprive Wellogix of such property or payment for such services in violation of Texas Penal Code § 31.03 and § 31.04.  Additionally and/or alternatively SAP stole, made copies of, communicated and/or transmitted Wellogix's trade secrets in violation of Texas Penal Code §31.05. SAP is therefore liable pursuant to the Texas Theft Liability Act as described in Texas Civil Prac. & Rem. Code § 134.001 *et seq*.  As a result, Wellogix has suffered substantial damage.

37.     Wellogix is entitled to actual and exemplary damages for which it now sues.  Further, Wellogix is entitled to costs and reasonable and necessary attorney's fees.

## EXEMPLARY DAMAGES

38.     Wellogix repeats and re-alleges the allegations of the paragraphs in this Complaint as if fully set forth herein.

39.     In stealing Wellogix's trade secrets and confidential information as well as the knowing and willful commission of the other tortuous acts as outlined above, SAP has demonstrated specific intent to cause substantial injury or harm to Wellogix.  SAP has committed acts amounting to fraud, malice, and gross negligence.  As such, Wellogix requests exemplary damages for all causes of action for which exemplary damages are available pursuant to Texas Civil Practices and Remedies Code Chapter 41 and other applicable Texas law.  In addition, based on the violation of Texas Penal Code §§ 31.03, 31.04 and 31.05, SAP's acts constitute negligence per se.  SAP's theft of trade secrets constitutes felonious conduct under Texas Penal Code Chapter 31, which exempts SAP's misconduct from the exemplary damages cap in Texas Civil Practices and Remedies Code § 41.008.  Wellogix therefore requests uncapped exemplary damages—such damages are necessary to penalize Accenture for its malicious, and morally culpable misconduct and to deter similar misconduct in the future.

## ATTORNEY'S FEES

40.     Wellogix repeats and re-alleges the allegations of the paragraphs of this Complaint as if fully set forth herein.

41.     Wellogix is entitled to its reasonable and necessary attorney's fees for SAP's theft under Chapter 134 of the Texas Civil Practices & Remedies Code.

## JURY DEMANDED

42.     Wellogix demands a trial by jury in this case.

## PRAYER

WHEREFORE, Wellogix prays for judgment against SAP as follows:

(a)     Actual damages;

(b)     Exemplary damages as allowed by applicable statutes;

(c)     Attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 134.005;

(d)     Pre-judgment and post judgment interest as allowed by law;

(e)     Costs of court as allowed by law; and

(f)     Any such other relief that this Court deems just and proper.

Respectfully submitted,

LAMINACK, PIRTLE & MARTINES, L.L.P.

/s/ Buffy K. Martines_____
Richard N. Laminack
Attorney-In-Charge
State Bar No. 11850350
Federal I.D. No. 79678
Thomas W. Pirtle
State Bar No. 16038610
Federal I.D. No. 15527
Buffy K. Martines
State Bar No. 24030311
Federal I.D. No. 34830
5020 Montrose Blvd, 9th Floor
Houston, Texas 77006
Telephone: 713-292-2750
Facsimile:  713-292-2755

ATTORNEYS FOR PLAINTIFF WELLOGIX, INC.